IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KA'SHAAD W., by and through his Parent, :
TANEESHA B.,                           :
of Delaware County, Pa.                :
                                       :       Civil Action
            Plaintiffs                 :
      v.                               :       No.
                                       :
UPPER DARBY                            :
SCHOOL DISTRICT                        :
4611 Bond Ave,                         :
Drexel Hill, Pa., 19026                :
                                       :
            Defendant.                 :

## COMPLAINT

### I.   Introduction

1.      This action is brought by Ka'Shaad W., a minor child with disabilities, and his

parent, Taneesha B. (collectively referred to as "Plaintiffs" or the "Family"), against Defendant

Upper Darby School District (the "District") under the Individuals with Disabilities Education Act

("IDEA"), 20 U.S.C. § 1400, *et seq.*, and its federal and state implementing regulations; Section

504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, and its federal and state

implementing regulations; the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C.

§ 12101, *et seq.*, and its federal and state implementing-regulations; and Chapters 14 and 15 of the

Pennsylvania Code.

2.      After fully considering the entire record and the failures of the District to provide

Ka'Shaad with a Free Appropriate Public Education ("FAPE") in multiple ways, this Court should

determine that the District violated the foregoing statutes; affirm the Hearing Officer's award of

compensatory education from April 18, 2022 until Ka'Shaad began an appropriate out-of-District

program; reverse the Hearing Officer's determination that Ka'Shaad was provided FAPE during

1

the 2020-21 school year and 2021-22 school year up to April 18, 2022; reverse the Hearing Officer's determination that the District is permitted to subtract tutoring hours from the Family's compensatory education award; and award appropriate relief to the Family. The Plaintiffs, as the prevailing party, also seek an award of statutory attorneys' fees and costs and other appropriate relief.

## II.     Procedural History

3.      On March 7, 2022, Ka'Shaad's parent, Taneesha B., by and through the undersigned counsel, filed an administrative due process complaint with the Pennsylvania Department of Education alleging denials of FAPE under IDEA and Section 504.

4.      Following an evidentiary hearing, held on April 21, 2022, June 15, 2022, and June 16, 2022, administrative Hearing Officer Cathy Skidmore issued a written decision on July 31, 2022, ordering relief to the Family for the period of April 18, 2022 until Ka'Shaad began an appropriate out-of-District program, but denying the Family relief prior to April 18, 2022 during the 2020-21 and 2021-22 school years.

5.      The Family now appeals to this Court and respectfully requests the Court reverse Hearing Officer Skidmore's decision as described in paragraph 2 above.

## III.    Parties

6.      Ka'Shaad was born in 2011, and, at all times relevant to this action, was a student of the Defendant School District due to residence in the District with his parent, Taneesha B., or due to the operation of McKinney-Vento Homeless Assistance Act. 42 U.S.C. § 11431 *et seq.*; 42 U.S.C. § 11432(g)(3)(A). Ka'Shaad is a student with disabilities as defined under IDEA, and a Protected Handicapped Student under Section 504 and the ADA.

2

7.      In February 2022, Taneesha B. and Ka'Shaad became homeless when their land-lord sold their rental property and they were unable to locate other housing. Ka'Shaad is temporarily residing with his father in his grandmother's home. The intent of Taneesha B. and Ka'Shaad's father is to have Ka'Shaad move to a permanent residence in the District with Taneesha B. when one can be located.

8.      Pursuant to 42 U.S.C. § 11432(g)(3)(A), the District remains Ka'Shaad's Local Education Agency responsible for his education because it is his school of origin and he is still experiencing homelessness.

9.      The District is located at 4611 Bond Ave, Drexel Hill, Pennsylvania. The District is the recipient of several sources of federal funds and is an educational agency designated by Pennsylvania law and the Pennsylvania Department of Education for the provision of educational services to individuals residing within its boundaries. Such services include those mandated under IDEA and Section 504. *See* 22 Pa. Code Chapters 14 and 15; *see also* 24 P.S. Chapter 13.

## IV.   <u>Jurisdiction and Venue</u>

10.      This Court has original jurisdiction over this appeal pursuant to 28 U.S.C. § 1331 because this case raises federal questions under the IDEA, Section 504, and the ADA.

11.      Plaintiffs have exhausted their administrative remedies where required under 20 U.S.C. § 1415(i), having timely pursued a Special Education Due Process hearing. *See* 20 U.S.C. § 1415(i)(2)(A).

12.      The Family's claims and remedies are authorized by 20 U.S.C. § 1415; 29 U.S.C. § 794(a); and 28 U.S.C. §§ 2201 and 2202. These statutes provide for declaratory relief and any further relief that this Court deems necessary and proper.

13.      All of the Defendant's actions have taken place within the jurisdiction of the United

States District Court for the Eastern District of Pennsylvania. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391.

## V. Standard of Review

14.     This Court is required to undertake a fully independent review of the record and the Hearing Officer's decision. *Rowley v. Board of Educ.*, 458 U.S. 176, 206-07, 102 S.Ct. 3034 (1982). This review is far broader and more searching than a district court's review of other administrative matters. In this regard, "[j]udicial review in IDEA cases differs substantively from judicial review in other agency actions, in which the courts are generally confined to the administrative record and are held to a highly deferential standard of review." *Susan N. v. Wilson School District*, 70 F.3d 751, 757 (3d Cir. 1995). The standard of review is called "modified de novo" review. *S.H. v. State-Operated Sch. Dist. Of City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003)

15.     In conducting this independent review, district courts: (i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate. 20 U.S.C. § 1415(i)(2)(B).

16.     However, modified de novo review does not apply to Section 504 and ADA claims. *K.N. v. Gloucester City Bd. Of Edu.*, 379 F.Supp.3d 334, 344 (D.N.J. 2019). Thus, a federal district court applies a de novo standard of review for the Section 504 and ADA claims, rather than the modified de novo standard of review that the Court will apply for the IDEA claims. *Id. (citing T.F. v. Fox Chapel Area Sch. Dist.*, 589 F.App'x 594, 598 (3d Cir. 2014)).

## VI. Applicable Law

### A. The IDEA requires school districts to create an IEP that offers the student a Free Appropriate Public Education.

17.     The IDEA provides that an IEP team, which includes both school officials and the

child's parents, must develop an appropriate educational program and placement for each eligible child through an IEP. A two-pronged analysis applies in reviewing a school district's IEP development under the IDEA: (1) whether the district complied with the procedures set forth in the IDEA; and (2) whether the IEP developed through the IDEA's procedures is reasonably calculated to enable the child to receive meaningful educational benefit. *Board of Educ. v. Rowley*, 458 U.S. 176, 206-07, 102 S.Ct. 3034 (1982); *Endrew F. v. Douglas County School District RE-1*, ___ U.S. ___, 137 S. Ct. 988, 999 (2017).

18.     The IDEA requires that every IEP include a statement of the child's present levels of academic achievement and functional performance; a statement of measurable annual goals; a description of how the child's progress toward meeting the annual goals will be measured and when periodic reports on the progress the child is making toward meeting the annual goals will be made; a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child; a statement of the program modifications or supports for school personnel that will be provided to enable the child to advance appropriately toward attaining the annual goals, to be involved in and make progress in the general education curriculum; and an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class and in activities. 20 U.S.C. §1414(d); 34 C.F.R. § 300.320.

19.     The United States Supreme Court in its decision in *Endrew F.*, *supra*, emphasized that IDEA requires more than a program reasonably calculated to allow a student to make "*some* progress." *Endrew F.*, 137 S. Ct. at 997, 1000-01 (emphasis added). Instead, IDEA "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* at 999.

5

20.     In addition, an "educational program must be appropriately ambitious in light of his circumstances," as minimal "progress from year to year can hardly be said to have been offered an education at all." *Id.* at 999-1001. "The goals may differ, but every child should have the chance to meet challenging objectives." *Id.* at 1000.

21.     The progress standard set forth in *Endrew F.* is therefore consistent with, and expands upon, the standard that has been applied for many years in this Circuit, requiring that a student must receive a program that is reasonably calculated to allow a student to make *meaningful* educational progress and achieve "significant learning." *Brandywine Heights Area School Dist. v. B.M.*, 248 F. Supp.3d 618, 632 (E.D. Pa. 2017) (*citing Endrew F.*; *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 390 (3d Cir. 2006)).

22.     It is well-settled that "education" extends beyond discrete academic skill, and includes the social, emotional, behavioral, and physical progress necessary to move the child toward meaningful independence and self-sufficiency consistent with the child's cognitive potential. *M.C. v. Central Regional Sch. Dist.*, 81 F.3d 389, 393-94 (3d Cir. 1996); *see also Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171, 181-182 (3d Cir 1988); *Kruelle v. New Castle County School Dist.*, 642 F.2d 687, 693 (3d Cir. 1981); *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 557 (3d Cir. 2010); *G.D. v. Wissahickon Sch. Dist.*, 832 F.Supp.2d 455, 467 (E.D. Pa. 2011) (Finding a FAPE violation based on the failure to develop a positive behavior support plan for a student despite his above average cognitive abilities and academic progress).

**B.      Changes to a student's program and placement are IEP team decisions and parents must be allowed to meaningfully participate in the team decisions.**

23.     Proposed changes to the identification, placement or provision of FAPE must be a decision of the IEP team, which includes the parents, and made at an IEP meeting, unless the

parents agree in writing that the revision can be made without a meeting. 34 C.F.R. §§ 300.320 - 300.324.

24.     Prior written notice of any such proposed changes must be provided to the parent. 34 C.F.R. § 300.503.

25.     IDEA stresses the importance of "strengthening the role and responsibility of parents and ensuring that families of such children have meaningful opportunities to participate in the education of their children at school and at home." 20 U.S.C. § 1400.

26.     Parents, as IEP team members, must be allowed to meaningfully participate in the IEP drafting process. *Montgomery Cnty. Intermediate Unit No. 23 v. A.F.*, 506 F.Supp.3d 293, 309 (E.D. Pa. 2020) (hereinafter, "MCIU") (*quoting D.B. ex rel. H.B. v. Gloucester Twp. Sch. Dist.*, 751 F.Supp. 2d 764, 776 n.15 (D.N.J. 2010), *aff'd sub nom. D.B. v. Gloucester Twp. Sch. Dist.*, 489 F. App'x 564 (3d Cir. 2012)). "Meaningful participation is assessed on an individual basis." *T.R. v. School Dist. of Philadelphia*, 2019 WL 1745737, *16 (E.D. Pa. April 18, 2019) (collecting cases). Meaningful participation requires a reasonable degree of understanding to allow parents to make an informed decision about their child's education. *MCIU*, 506 F.Supp.3d at 306. "Predetermination of an IEP can be grounds for finding a violation of the IDEA, in particular because predetermination can serve to exclude parents from meaningfully participating in the decision making process." *D.B.*, 751 F.Supp.2d at 771; *Cf. Fuhrmann v. East Hanover Bd. Of Educ.*, 993 F.2d 1031, 1036-1037 (3d Cir. 1993) (no predetermination when parents were meaningfully involved in the IEP development).

27.     An Approved Private School may not unilaterally suspend or expel a special education student without a due process hearing, and has no right to initiate due process. *Woods School v. Commonwealth, Dept. of Education*, 100 Pa.Cmwlth. 375 (1986).

**C.**     **School districts are prohibited from discrimination against students with disabilities under Section 504.**

28.     Section 504 provides additional protections for children with disabilities by prohibiting discrimination against handicapped persons in federally funded programs such as public education. Section 504 and its regulations require the identification of all disabled children and the provision of appropriate educational services. 29 U.S.C. § 794; 34 C.F.R. § 104.1 *et seq.*

*29.*     Under Section 504, a "handicapped person" is defined as "any person who has a physical or mental impairment which substantially limits one or more major life activities." 34 C.F.R. § 104.3. The term "physical or mental impairment" is defined as "any physical or psychological disorder such as . . . emotional or mental illness and specific learning disabilities." *Id.* The term "major life activities" is defined as "functions such as caring for one's self . . . learning, and working." *Id.*

30.     Under Section 504, recipients of federal funds are required to "provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. § 104.33(a).   The term "appropriate education" is defined as "the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of the handicapped persons as adequately as the needs of non-handicapped persons are met and (ii) are based on adherence to the procedures that satisfy the requirements of Section 104.34, 104.35, and 104.36." 34 C.F.R. § 104.33(b).

31.     If a child is identified by a school district under IDEA, *and* the provisions of that Act are fulfilled, the school district's responsibilities under Section 504 are also fulfilled. However, where a school district fails to conform to IDEA, or where a child is eligible under Section 504 but

not IDEA, a school district must provide the services and protections required by Section 504. 34 C.F.R. § 104.32 - 36 *et seq.*; *Ridgewood Board of Educ. v. N.E.*, 172 F.3d 238, 253 (3d Cir. 1999); *W.B. v. Matula*, 67 F.3d 484, 492 (3d Cir. 1995).

32.     A student with a disability who is otherwise qualified to participate in a school program, and was denied the benefits of the program or otherwise discriminated against on the basis of disability, has been subject to disability discrimination in violation of Section 504 protections. 34 C.F.R. § 104.4; *S.H. v. Lower Merion School District*, 729 F. 3d 248 (3d Cir. 2013).

**D.     Where a school district violates IDEA and Section 504, it also violates the ADA.**

33.     The ADA provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." The Third Circuit has held that the ADA "extends the nondiscrimination rule of [Section 504] to services provided by any 'public entity' (without regard to whether the entity is a recipient of federal funds)." *Jeremy H. v. Mount Lebanon School Dist.*, 95 F.3d 272, 279 (3d Cir. 1996). As with IDEA and Section 504, the ADA requires districts to offer all students FAPE without a showing of intent or bad faith as any denial of FAPE violates these federal laws. *Id.* While many damage claims (not at issue here) require a different level of culpability, the ADA's causation standard is lower than Section 504, and does not require the disability to be the "sole cause" of the discrimination or denial of benefits, rather "the ADA only requires 'but-for' causation," i.e. but for the disability, there would be no discrimination or denial of benefits. *Furgess v. Pa. Dep't. Of Corr.*, 933 F.3d 285 (3d Cir. 2019).

**E.     Compensatory education is an established remedy for denials of FAPE and it is well-established that parents should be able to direct the uses of compensatory education.**

34.     When a District fails to provide FAPE under both the IDEA and Section 504, it is well-settled that compensatory education is an available remedy for the student. *Lester H. v. Gilhool*, 916 F.2d 865 (3d Cir. 1990); *Ridgewood*, 172 F.3d at 250 n.11; *M.C.*, 81 F.3d at 397. Compensatory education is designed to provide eligible students with the services they should have received pursuant to a FAPE. *Lester H.*, 916 F.2d at 873 (holding that an award of compensatory education merely compensated the student for an inappropriate placement, belatedly allowing student to receive the remainder of his FAPE). The amount of compensatory education is calculated by finding the period of deprivation of special education services and excluding the time reasonably required for the school district to rectify the problem. *M.C.*, 81 F.3d at 397. Thus, compensatory education is an in-kind remedy intended to provide educational services denied to a child by a school district's failure to provide a FAPE. *Lester H.*, 916 F.2d at 873.

35.     Pennsylvania district courts have held that a student's parent should determine the nature and scope of compensatory education as long as it takes the form of any appropriate developmental, remedial or enriching instruction. *Heather D. v. Northampton Area School Dist.*, 511 F.Supp.2d 549 (E.D.Pa. 2007); *Keystone Central School District v. E.E.*, 438 F.Supp.2d 519 (M.D.Pa. 2006) (parents should be permitted to arrange for compensatory education without the need to "incorporate the District in the implementation and use of the compensatory education award [as] it is illogical to force the student to receive compensatory education through the District, which is the entity that failed to provide him with FAPE in the first place."). Further, "Mandating participation with or through the District would only expose the parties to further tension and potential future litigation." *Id.*

F.     **A parent is entitled to attorney's fees and costs if the parent is the prevailing party.**

36. The IDEA, Section 504, and the ADA all permit the recovery of reasonable attorneys' fees and costs by parents who prevail in an action or proceeding thereunder. 20 U.S.C. § 1415; 42 U.S.C. § 12205; 34 C.F.R. § 300.517; 29 U.S.C. § 794a.

## VII.  Factual History

37. Plaintiffs incorporate by reference the preceding paragraphs.

38. Ka'Shaad is a ten-year-old student who is diagnosed with Autism Spectrum Disorder, Anxiety, and Attention Deficit Hyperactivity Disorder ("ADHD") and is eligible under the IDEA for special education under the primary classification of Autism and secondary classifications of Emotional Disturbance ("ED") and Other Health Impairment ("OHI").

39. Ka'Shaad, for the majority of the time period at issue, resided with his mother, Taneesha B., within the boundaries of the District, and is currently still a student of the District due to the operation of the McKinney-Vento Homeless Assistance Act.

40. After an especially problematic start to second grade, in late April 2019, Ka'Shaad was placed by the School District at the Vanguard School ("Vanguard").

41. Ka'Shaad remained at Vanguard for the 2019-20 school year.

42. At the start of the 2020-21 school year, the District placed Ka'Shaad through the IEP process at the Philadelphia Campus of the YALE School ("YALE"), a private academic school licensed through the Pennsylvania Department of Education ("PDE").

43. Ka'Shaad initially began attending YALE virtually due to the COVID-19 pandemic, but he switched to in-person instruction by November 2, 2020.

44. At the time of his initial placement at YALE, the District and YALE relied upon the IEP developed by Vanguard and then convened an IEP team meeting on or about December 4, 2020, approximately 3 months after Ka'Shaad started at YALE, to develop his first YALE IEP.

11

45.     During the prior school year at Vanguard, Ka'Shaad had been privately evaluated, at the District's expense, by Dr. Steven Kachmar, resulting in a report issued on September 19, 2019.

46.     The results of Dr. Kachmar's evaluation revealed cognitive performance ranging from below average to average, with academic achievement ranging from low to average performance.

47.     Dr. Kachmar's testing also revealed that Ka'Shaad has significant issues with executive functioning and social-emotional and behavioral functioning, including engaging in hyperactivity, rule-breaking behavior, aggression, anxiety and depression, and attentional issues, along with well below average social skills.

48.     Dr. Kachmar's report was not considered by Vanguard at the time, and the report was not reviewed or considered by YALE at any time.

49.     The December 2020 IEP contains inadequate present education levels and inappropriate goals which failed to appropriately address all his needs or provide a sufficient and objective means for monitoring progress including a lack of any goals related to social-emotional skills, behavior, and self-regulation.

50.     The Special Considerations section did not note that Ka'Shaad has communication needs or that he displayed behaviors that impeded his learning and the learning of others, despite his history of such needs.

51.     The IEP included insufficient speech and communication supports and services and lacked an individualized Positive Behavior Support Plan ("PBSP") or Functional Behavior Assessment ("FBA").

52.     The Special Considerations section also notes that Ka'Shaad has no assistive technology needs; however, no assistive technology evaluation was conducted to make this determination.

53.     The IEP also included inadequate and inappropriate specially designed instruction ("SDI"), inappropriate and insufficient behavior plans/supports not based on appropriate assessments (i.e., no FBA), insufficient related services, no meaningful supports for school personnel, and inappropriate extended school year ("ESY") services[1]. Additionally, there were regular issues/concerns with the consistent implementation of the supports and services identified in the IEPs.

54.     Over the course of the 2020-21 school year, the Parent would advocate on behalf of Ka'Shaad when she had programmatic concerns.

55.     Parent did not receive copies of Ka'Shaad's progress reports or any of the progress monitoring data upon which the progress reports were allegedly based.

56.     Notwithstanding, Parent did have concerns about Ka'Shaad's program based on what she was seeing Ka'Shaad do at home and based on what Ka'Shaad reported to Parent about school.

57.     Parent brought these concerns to the District and YALE, but they were regularly ignored.

58.     On one occasion, on or about February 24, 2021, the IEP team reconvened to discuss some of the Parent's concerns, but no meaningful revisions to the IEP were made.

---

[1] Although the ESY services offered through the IEP process were inappropriate, the Family and District had reached an agreement regarding ESY for the summer of 2021, and as such that year's ESY services were not at issue. However, ESY for the summer of 2022 was at issue and the Hearing Officer's decision failed to address Ka'Shaad's need for an ESY program.

59.     A comparison of Ka'Shaad's present educational levels and data collected while at YALE revealed no or minimal progress.

60.     On the Qualitative Reading Inventory ("QRI") administered in September of 2020 by YALE, Ka'Shaad was independent in reading comprehension at a Pre-primer Level, instructional at a Primer and 1st grade level, and at a frustration on levels 2 through 4.

61.     Results of a September 2021 QRI also administered by YALE show that, a year later, Ka'Shaad remained independent at Pre-primer level (making no progress) but was now at frustration on a 1st grade level, demonstrating regression.

62.     In September of 2020, on the Word Identification and Spelling Test ("WIST") published by the Wilson Reading System, Ka'Shaad was in the very poor range with a percentile rank of 1% in Reading, Spelling, and Sound-Symbol Knowledge. When the WIST was administered over a year later in November of 2021, Ka'Shaad again was in the very poor range with a percentile rank of 1% in Reading, Spelling, and Sound-Symbol Knowledge, showing no progress.

63.     Results of the Scholastic Reading Inventory ("SRI") administration in September of 2020 and again in November of 2021, also show his score decreased from a 2nd grade level to a Beginning Reader ("BR") level.

64.     Due to Parent's concerns over the programming being provided to Ka'Shaad, towards the end of the 2020-21 school year, Parent requested and obtained an Independent Educational Evaluation ("IEE ") from the School District, conducted by Dr. Eric Mitchell at Neurodiversity Consultants, LLC.

65.     Testing occurred over the summer and early fall of 2021, and a final report was issued on or about September 25, 2021.

66.     According to the results of Dr. Mitchell's report, Ka'Shaad's overall cognitive ability falls within the very low range; however, Dr. Mitchell cautioned that Ka'Shaad's true ability level may well be higher given his difficulty responding directly to test questions without impulsive behaviors, the overall variability in scores, and higher testing scores in earlier assessments.

67.     Dr. Mitchell's report revealed that Ka'Shaad's academic abilities based on the Wechsler Individual Achievement Test, Fourth Edition ("WIAT-IV") fall within the very low to extremely low ranges, with some low average to average performance.

68.     Additionally Dr. Mitchell determined that Ka'Shaad has significant needs related to social communication, safety, anger, confusion, disruptive behavior, difficulty with change, aggression, and anxiety, as well as adaptive behaviors.

69.     Dr. Mitchell's report also included a variety of academic, social-emotional, and behavioral recommendations for supports and SDI that are necessary for Ka'Shaad to receive a FAPE.

70.     Dr. Mitchell concluded that most of the recommendations contained in Dr. Kachmar's 2019 report – which were never considered by the District or any of Ka'Shaad's IEP teams – remain relevant and appropriate for Ka'Shaad.

71.     Dr. Mitchell also recommended that Ka'Shaad receive instruction in social skills and behavior/emotional regulation skills, that a Positive Behavior Support Plan be developed for him, and that the plan be revised on a regular basis.

72.     A copy of Dr. Mitchell's report was promptly provided to the District and YALE.

73.     No IEP team meeting was convened in response to the report, and the evaluation was never considered by the District or YALE.

74. Ka'Shaad's IEP was never revised to include the supports and services recommended by Dr. Mitchell.

75. Over the summer of 2021, the Parent contacted YALE to speak with the Director of the school regarding concerns with the program, and in particular, with a specific administrator, Jackie Turner, who is a Program Supervisor at YALE.

76. That conversation ultimately never occurred, first because YALE refused to schedule the call and then because Parent experienced e-mail issues, which prevented her from timely receiving the invitation.

77. As the school year progressed, Parent continued to have concerns over Ka'Shaad's program, and continued to advocate on his behalf regarding those concerns.

78. At the hearing, Parent expressed that she can become frustrated and yell in some situations, but that she first tried to express her concerns about Ka'Shaad's education multiple times to no avail.

79. As a result of Parent's advocacy, and in response to concerns she raised regarding Ms. Turner, in early November 2021, the District received notice from YALE that it was terminating its services for Ka'Shaad, and that his last day would be Friday, November 19th.

80. YALE later extended Ka'Shaad last day until Tuesday, November 23rd.

81. The decision to terminate Ka'Shaad's placement at YALE was not discussed or made at an IEP meeting, nor was it a decision made by the IEP team or based on Ka'Shaad or his needs.

82. No prior written notice was issued to Parent reflecting the decision to remove Ka'Shaad from YALE.

83.     Unbeknownst to the Family, the District made referrals, without parental input or consent, to several Approved Private Schools ("APS"), including the Devereux Foundation and Royer-Greaves School For the Blind, as well as the Delaware County Intermediate Unit ("DCIU"), and informed the Parent of those referrals through counsel after-the-fact.

84.     In response, on or about November 15, 2021, the Family, through counsel, filed a due process hearing to challenge Ka'Shaad's removal from YALE outside of the IEP process.

85.     A few days later, on Wednesday, November 17, 2021, the Family and their counsel were informed that the District was convening an IEP meeting on Monday, November 22, 2021, with staff from Devereux Brandywine, the new placement the District was recommending.

86.     The District was advised that same day that the Family and Counsel were not available due to scheduling conflicts on November 22nd (and that due to the Thanksgiving holiday, Counsel was not available the remainder of the week), but that the Family did want to participate in the IEP process.

87.     The District, along with staff from Devereux, moved forward with the IEP meeting without the Family, wherein Ka'Shaad's program was revised, including a change in placement to Devereux from YALE.

88.     All of the goals from the December 2020 IEP were carried over to the November 22, 2021, IEP unchanged.

89.     Two new vague and unmeasurable goals, with no objective baseline data related to "skill development" and "counseling" are also contained in the November 22, 2021, IEP.

90.     The District did not make changes to the Specially Designed Instruction section in the November 22, 2021, IEP; did not propose a Functional Behavior Assessment; and did not include an individual PBSP or recommend that one be developed upon attendance at Devereux.

91.     Under Related Services, the only change the District made in the November 22, 2021, IEP was a reduction in qualifications for the individual providing Wilson instruction[2] from a Wilson certified reading specialist to a Wilson trained reading specialist.

92.     This reduction in qualifications was not based upon Ka'Shaad's needs but made for administrative convenience.

93.     Ka'Shaad remained eligible for ESY 2022, but the District did not offer an appropriate program for it.

94.     The District issued Prior Written Notice to the Family, which the Family rejected.

95.     On November 30, 2021, the parties, including counsel, participated in another IEP meeting.

96.     No changes were made to the programming or placement determinations made at the November 22, 2021.

97.     Although a new IEP and Prior Written Notice were not issued following the November 30, 2021, IEP meeting, the Family rejected that placement.

98.     The parties reached an interim agreement that in relevant part provided for, among other things, referrals to be made by the District on behalf of Ka'Shaad to certain mutually agreeable placements, and the provision of tutoring/instruction in the home through Neurodiversity Consultants, funded by the District, while alternative placements were being investigated.

---

[2] Wilson Reading System ("Wilson") is a program of intensive instruction that systematically teaches the structure of the English language. It is meant to be implemented by a certified Wilson instructor. The Wilson Level I Certification program includes 90 hours of online coursework and an intensive 60-lesson supervised practicum with a Wilson Trainer. Some teachers will attend only a three-day Wilson Reading System introductory course. Wilson Reading System does not consider teachers who have attended the three day course as "trained in the Wilson Reading System." *See* https://www.wilsonlanguage.com/parents/why-wrs-certification/.

99.     Initially there were delays in providing the tutoring, but by sometime in late January 2022, some tutoring was provided.

100.     However, there continued to be issues with consistency in the provision of the tutoring, mostly related to payment by the District for travel time associated with tutoring, and eventually the tutoring stopped.

101.     Although in April of 2022 the District did eventually agree to pay travel time associated with the tutoring services, no one ever reached out to the family to restart services.

102.     Parent and Ka'Shaad became homeless in February of 2022 when their then landlord sold the home they were renting, and Parent could not find alternative Section 8 housing.

103.     Parent decided to have Ka'Shaad temporarily live at his paternal grandmother's home where his father resides.

104.     At the due process hearing, Parent testified that it is her intent to find housing within the boundaries with Upper Darby School District.

105.     As of the close of hearing, Parent was not able to secure housing.

106.     Taneesha B.'s and Student's father's choice of school district during the period of homelessness is the Upper Darby School District, which is Ka'Shaad's school of origin.

107.     The identified placements in the interim agreement did not accept Ka'Shaad, although the reasons for non-acceptance are not clear for all of the placements, and the District was not willing at that time to discuss or consider any other placements.

108.     Given the issues with the provision of the agreed upon tutoring and given that an alternative placement had still not been identified, the Parent filed the administrative due process complaint on March 7, 2022.

109.     On July 31, 2022, Hearing Officer Skidmore issued her decision finding in part

for the Parent.

## VIII. The Hearing Officer's Errors

110.    The Plaintiffs incorporate by reference the preceding paragraphs.

111.    Pursuant to the above standards, the District unquestionably failed in its statutory duties to Ka'Shaad and the Hearing Officer erred in ruling otherwise with regard to the 2020-21 school year and 2021-22 school year before April 18, 2022.

112.    Hearing Officer Skidmore incorrectly determined that the District's December 2020 IEP was appropriate; it was facially, legally inappropriate due, *inter alia*, to its: (i) insufficient Present Educational Levels; (ii) minimal Goals, which fail to address several critical areas of need identified by the 2019 Independent Educational Evaluation such as social-emotional skills, behavior, and self-regulation; (iii) lack of any individualized PBSP based on a FBA; (iv) insufficient speech and language services; and (v) insufficient Specially Designed Instruction including the failure to consider and include needed supports identified in the 2019 Independent Educational Evaluation.

113.    Hearing Officer Skidmore incorrectly determined that the District's November 2021 IEP was appropriate; it was facially, legally inappropriate due, *inter alia*, to its: (i) vague and unmeasurable goals, with no objective baseline data; (ii) its continuation of the same support and services despite Ka'Shaad's deteriorating behaviors; (iii) its lack of an individualized PBSP and FBA; (iv) its reduction in qualifications for the individual providing Wilson instruction from a Wilson certified reading specialist to a Wilson trained reading specialist.

114.    Both IEPs impermissibly omitted an individualized PBSP based on the results of an FBA despite the two independent evaluations that found that Ka'Shaad requires one; as a result, Ka'Shaad's behavioral needs were not met at YALE and the Hearing Officer's conclusion that

Ka'Shaad was provided FAPE is incorrect.

115.    The Hearing Officer impermissibly speculated that, had Ka'Shaad been permitted to remain at YALE, he likely would have been provided with an individualized behavior plan at some point during the 2021-22 school year.

116.    The Hearing Officer erred when she did not find a lack of meaningful progress. Ka'Shaad not only did not make progress, as demonstrated on several objective measures, but his IEPs were not reasonably calculated to yield meaningful progress.

117.    The Hearing Officer correctly determined that Ka'Shaad was denied FAPE from April 18, 2022 until his start date at an appropriate out-of-District placement; however, the Hearing Officer erred by: (i) omiting Extended School Year (summer) 2022 from the calculation, and (ii) permitting the District to deduct tutoring hours from the compensatory education. In fact, Ka'Shaad was entitled to an appropriate ESY program and none was offered in summer of 2022. Likewise, the District was no longer providing any tutoring hours to Ka'Shaad by April 2022.

118.    Hearing Officer Skidmore erred when she found that the Family did not meet its burden to establish the inappropriateness of the IEP because it failed to introduce behavior data. Behavioral data did not exist because the IEP failed to acknowledge behavioral needs and did not include any behavior goal. Parent produced more than preponderant evidence from two independent evaluators that Ka'Shaad required this support and that the District failed to provide any individualized behavior plan or include any measurable behavior goals.

119.    Hearing Officer Skidmore incorrectly excused the District's unilateral decision to remove Ka'Shaad from YALE by likening it to a change in physical location only; the change also resulted in reduction in the qualification of staff providing Ka'Shaad's reading instruction and was not permissibly undertaken for reasons other than the needs of the child. Moreover, there is no

provision in the IDEA that permits change in placement without parental participation and prior written notice. Finally, Pennsylvania courts have determined that an APS may not unilaterally suspend or expel a special education student without due process.

120. The evidence established that the District violated Section 504 by failing to appropriately evaluate Ka'Shaad and failing to provide or offer him an appropriate program that meaningfully addressed his disabilities, all of which denied him meaningful educational benefit.

121. The evidence established that the District violated the ADA for the same reasons that it has violated the IDEA and Section 504, all of which excluded Ka'Shaad from participation in and denied Ka'Shaad the benefits of the services, programs, or activities of a public entity and subjected him to discrimination.

**WHEREFORE**, the Plaintiffs respectfully requests that this Court:

1. Assume jurisdiction over this action;

2. Hear additional evidence as requested by a party pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii);

3. Reverse the Hearing Officer's Decision to the extent that it denied compensatory education prior to April 18, 2022 and award the Family compensatory education for the (a) 2020-21 school year, (b) 2021-22 school year until April 18, 2022, and (c) ESY 2022;

4. Reverse the Hearing Officer's determination that the District may deduct tutoring hours from the Family's compensatory education;

5. Order the District to pay Plaintiffs' reasonable attorneys' fees and related costs;

6. Declare that the District's actions and omissions violated IDEA, Section 504, ADA and Pennsylvania law; and

7. Grant such other relief as this Court deems proper.

Respectfully submitted,

*Michael J. Connolly*
Michael J. Connolly, Esquire
PA ID No. 82065

*Jacqueline C. Lembeck*
Jacqueline C. Lembeck, Esquire
PA ID No. 314535

McANDREWS, MEHALICK, CONNOLLY,
HULSE and RYAN, P.C.
30 Cassatt Avenue
Berwyn, Pennsylvania 19312
Tele: 610-648-9300
Attorneys for Plaintiffs